In re ELSINORE SHORE ASSOCIATES f/k/a Playboy Elsinore Associates, a New Jersey Partnership d/b/a The Atlantis' Casino Hotel, Debtor.

ELSINORE SHORE ASSOCIATES, Plaintiff,

v.

LOCAL 54, HOTEL EMPLOYEES AND RESTAURANT EMPLOYEES INTERNATIONAL UNION, an unincorporated association, on behalf of itself and all of its members and individually and Roy Silbert, Individually and as President of Local 54, Hotel Employees and Restaurant Employees International Union and John Doe and Jane Doe Pickets, and all other conspiring or acting in concert with them or acting in their aid or behalf, Defendants.

Bankruptcy No. 85–06058.
Adv. No. 86–0159.

United States Bankruptcy Court, D. New Jersey.

Oct. 23, 1986.

See also, Bkrtcy., 66 B.R. 723, Bkrtcy., 67 B.R. 926.

Blank, Rome, Comisky & McCauley by Ronald H. Surkin, Sarah A. Kelly, Philadelphia, Pa., Crummy, Del Deo, Dolan, Griffinger & Vecchione by Michael R. Griffinger, Newark, N.J., for debtor.

Valore, McAllister, Westmoreland, Gould Vesper & Schwartz by Eric A. Browndorf, Northfield, N.J., for the Unsecured Creditors' Committee.

Meranze & Katz by Bernard N. Katz, Michael N. Katz, Cherry Hill, N.J., for Local 54 and all other named defendants.

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

This is an action initiated by plaintiff under the Labor Management Relations Act, as amended, 29 U.S.C. § 141 et seq., over which this court has jurisdiction under Section 301 thereof, 29 U.S.C. § 185, for an injunction against certain activities of defendants which plaintiff asserts is in derogation of the no-strike clause in the parties' Collective Bargaining Agreement and the defendants' obligations under the Collective Bargaining Agreement. Jurisdiction of the Bankruptcy Court over this adversary proceeding is founded on 11 U.S.C. § 105, 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(A).

The plaintiff is Elsinore Shore Associates, f/k/a Playboy Elsinore Associates, a New Jersey Partnership doing business as Atlantis Casino Hotel (Atlantis). Defendant is Local 54 of the Hotel Employees and Restaurant Employees International Union (Local 54). Also named as defendants are Roy Silbert, the President of Local 54 and John Doe and Jane Doe and all others who are conspiring, acting in concert or otherwise participating with the aforesaid named defendants or acting in their aid or behalf, including other officers and members of Local 54.

Atlantis operates a hotel and casino in Atlantic City, New Jersey. Atlantis is an employer within the meaning of Section 2(2) of the National Labor Relations Act (NLRA), as amended, 29 U.S.C. § 152(2) and has been and is engaged in an industry affecting commerce within the meaning of Section 2(7) of the NLRA, 29 U.S.C. § 152(7).

Defendant Local 54 is a labor organization within the meaning of Section 2(5) of the NLRA, 29 U.S.C. § 152(5), which represents employers employed by employers engaged in commerce within the meaning of Section 2(7) of the NLRA, 29 U.S.C. § 152(7). The individual defendants are officials, members, or agents of defendant Local 54.

The union advised Atlantis that it intended to exercise its right to engage in an

economic strike commencing September 16, 1986. Upon the filing of a Complaint by Atlantis, the uncontroverted Affidavit of Robert Bruce McKee, Vice President of Finance and Chief Financial Officer for Atlantis, filed on September 15, 1986, and after a preliminary hearing conducted on that date, this court on September 15, 1986, upon the posting of security in the form of a bond in the amount of $1,000.00 by Atlantis, entered a temporary restraining order prohibiting Local 54 and the named defendants from breaching their collective bargaining agreement with Atlantis by engaging in any strike sympathy strike, work stoppage, picketing, or mass picketing, slow down, sit down, sit-in, boycott, refusal to handle merchandise, cessation or interruption of work, abstaining in whole or in part from the full, faithful and proper performance of their duties of employment with Atlantis, or otherwise individually, or in concert, interfering with Atlantis' operations, assisting, encouraging, inducing, or sanctioning others to engage in any of the aforesaid activities, refusing to inform all employees of Atlantis covered by the collective bargaining agreement between the parties that the work stoppage or picketing at Atlantis is in violation of the agreement, and refusing to instruct such employees to cease any such conduct. The court further ordered the parties to undertake to comply with the grievance and arbitration provisions of the subject collective bargaining agreement with respect to the dispute underlying the then threatened unlawful job action. That order was based upon specific findings of fact contained in the court's oral decision of September 15, 1986, and its written opinion dated September 16, 1986. This court made findings that the dispute underlying the defendants' then threatened job action was over the respective rights of the parties and their differing interpretations of the wage reopener clause of the collective bargaining agreement, that that issue was subject to the broad grievance and arbitration provisions of Article IV of the collective bargaining agreement, and that Atlantis was ready, willing and able to submit that underlying dispute to arbitra-

tion, so that an injunction could issue under the authority of *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). *Boys Markets* represents an exception to the anti-injunction provision of the Norris LaGuardia Act, 29 U.S.C. § 104.

The temporary restraining order required the defendants to appear on September 24, 1986 to show cause why a preliminary injunction should not be entered, pending final determination of this action, enjoining and restraining the defendants from (a) directly or indirectly authorizing, assisting, encouraging, participating in or sanctioning any strike, picketing, sitdown, sit-in, slowdown, cessation or stoppage or interruption of work boycott, or other interference with the operations of Atlantis; (b) refusing to inform all employees of Atlantis covered by the collective bargaining agreement between the parties that the work stoppage or picketing at Atlantis is in violation of that agreement; (c) refusing to instruct such employees to cease any such unlawful conduct; (d) ordering defendants to comply with the grievance and arbitration provisions of the collective bargaining agreement with respect to the dispute underlying the unlawful job action; and (e) such other relief as this court may deem necessary, equitable and proper.

The court on September 24, 1986 continued the effect of the September 15, 1986 temporary restraining order until September 25, 1986, with the consent of all parties, and rescheduled the hearing on the preliminary injunction to September 25, 1986, at 9:00 a.m.

This court conducted a hearing on September 25, 1986 and makes the following findings of fact.

The debtor, Atlantis is engaged in the business of operating a hotel and casino in Atlantic City, New Jersey, and has been so engaged since prior to the filing of its Chapter 11 petition on November 14, 1985.

On October 19, 1983, Atlantis and Local 54 entered into a collective bargaining agreement (Agreement) which Agreement

was effective October 19, 1983 and expires September 15, 1988.

Article XXI of the Agreement involves the term of the contract and provides that, "This contract shall remain in full force and effect until September 14, 1988, provided, however, that for the exclusive purpose of negotiating wage rates and contribution levels for existing benefit funds as described in Article XV, this contract shall be reopened on September 15, 1986. Failing agreement, if this agreement is reopened, (consistent with terms and limits of the reopener) the Union *may* strike as if the contract had been terminated in accordance with all of the provisions of Article XVII."

Article XVII contains a no-strike clause. Paragraph 1 of Article XVII provides in pertinent part that "the Union agrees that it will not call, engage in or sanction any strike, sympathy strike, work stoppage, slow-down, picketing, sit-down, sit-in, boycott, refusal to handle merchandise or any other interference with the Employer's business for any reason whatsoever...." Paragraph 2 of Article XVII states that, "The Union agrees that notwithstanding the provisions of the termination of the contract, during the time of negotiations after the expiration date, the parties shall continue to operate in accordance with the terms of this Agreement as though same had not expired, unless Employer shall give written notice to the Union that it does not intend to operate under the terms of this Agreement, and the Union agrees that unless said notice is given by Employer, the provisions of Article XVII and XVIII herein shall be applicable during said period of negotiations."

Article IV of the Collective Bargaining Agreement sets forth a detailed grievances and arbitration procedure, pursuant to which "All timely grievances arising between the parties hereto, unless stipulated herein, involving questions of interpretation or application of any clause of this Agreement, or any acts, conduct or relations between the Parties, directly or indirectly which arise out of this Contract shall be resolved by utilization of the following method." Thereafter, a detailed grievance and arbitration procedure is outlined.

Atlantis advised Local 54 by letter dated September 4, 1986 from Atlantis' attorney, Peter S. Pantaleo, Esquire, to the union's attorney, Bernard Katz, Esquire, that Atlantis would continue to operate under the terms of the current collective bargaining agreement, including wage rates and contribution levels to the benefit funds, until such time as Local 54 and Atlantis agree to a modification. (P–1).

On September 12, 1986, Peter S. Pantaleo, on behalf of Atlantis again wrote to Bernard Katz, counsel for Local 54, stating that Atlantis was prepared to continue its efforts to reach an agreement with Local 54 and renewed its commitment contained in the letter of September 4, 1986, to operate under the terms of the collective bargaining agreement. (P–2). This letter was in response to a letter of Local 54 to Atlantis of September 9, 1986. In its letter of September 12, 1986, Atlantis declined the Union's invitation to arbitrate wage and contribution levels to benefit funds and further stated that because Atlantis had not altered any terms or conditions of employment of any bargaining unit employee, Atlantis would view a strike as illegal and in violation of the contract and the union's only alternative was to arbitrate that issue in accordance with Article IV of the Agreement.

On September 11, 1986, Local 54 of the Hotel Employees and Restaurant Employees International Union (Local 54) threatened to strike Atlantis at its location at 2500 Boardwalk, Atlantic City, New Jersey 08401, beginning at midnight on September 15, 1986.

Two earlier documents were admitted into evidence at the hearing for the preliminary injunction on September 25, 1986. On March 3, 1986, Frank Gerace, a labor consultant for Local 54, on behalf of Roy Silbert, President of Local 54, wrote to Stephen E. Tallent, the negotiator for the Casino Hotels of Atlantic City for the 1983 negotiations, to confirm their understanding of Article XXI of the collective

bargaining agreement between Local 54 and the Casino Hotels of Atlantic City, specifically whether it gave the union the right to strike on September 15, 1986 if there was no agreement concerning the reopener clause. (P–3). The letter states, in part:

It is my recollection that when you requested a five year agreement we agreed with your request, with the exception of wages and welfare payments for three years, with the reopener. We wanted you, if you remember, to guarantee us the right to strike if the negotiations failed. You prepared the language contained in Article XXI, and said that as far as you were concerned this would protect the Union's right to strike.

On July 24, 1986, Stephen Tallent wrote back to Frank Gerace. (P–4). This letter states, in part:

I believe that the language in Article XXI(2) is very clear and reflects the understanding that we reached. Failing agreement, the Union has the right to strike in accordance with the provision of Article XVII paragraph 2, that is, when the employer gives "written notice to the Union that it does not intend to operate under the terms of this Agreement."

Subsequent to the entry by this court of a temporary restraining order on September 15, 1986, Local 54 on September 16, 1986 at 12:01 a.m. engaged in a strike against Atlantis.

This court heard the testimony of Jeanne Hood, the President and Chief Operating Officer of Atlantis. Ms. Hood is involved in the ongoing negotiations between Atlantis and Local 54 arising out of the parties' collective bargaining agreement. Hood testified that Atlantis intended to continue operating under the terms and conditions of the existing collective bargaining agreement, notwithstanding the union and Atlantis' failure to reach an agreement under the wage reopener clause of the parties' collective bargaining agreement. Hood testified that her understanding of the dispute that led to the strike was the parties' rights under the wage reopener clause.

Jeanne Hood testified that Roy Silbert, the President of Local 54 and a defendant herein, advised Atlantis that the union believed that a wage increase was in order, and that if there was no settlement in that issue, the union had no alternative but to strike. Hood testified that Atlantis did not agree to the proposed wage increase. Thereafter, Local 54 engaged in a strike at 12:01 a.m. on September 16, 1986. Hood stated that Roy Silbert on behalf of Local 54 offered to submit the issue of a wage increase to arbitration in exchange for a pledge from the union not to strike and that counsel for Atlantis rejected this offer. (P–2). Hood testified further that Atlantis was willing to continue to negotiate over the issue of wages.

Under the Norris-La Guardia Act, as a general rule federal courts have no jurisdiction to issue a restraining order or injunction in enumerated circumstances, including work stoppages. 29 U.S. § 104(a). That prohibition extends to the bankruptcy court. *See In re Petrusch,* 667 F.2d 297 (2d Cir.1981), *cert. denied,* 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1982); *Crowe & Associates, Inc. v. Bricklayers and Masons Union Local 2 of Detroit, Michigan,* 20 B.R. 225 (E.D.Mich.1982), *aff'd.,* 713 F.2d 211 (6th Cir.1983); *In re Warren-Ehret-Linck Company,* 52 B.R. 47 (Bkrtcy.E.D.Pa.1985); *In re Sterling Mining Company, Inc.,* 21 B.R. 66 (Bkrtcy.W.D.Va.1982).

The United States Supreme Court in the case of *Boys Markets Inc. v. Retail Clerk's Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), carried out a narrow exception to the anti-injunction rule. In *Boys Markets,* the plaintiff and defendant were parties to a collective bargaining agreement which provided that all controversies concerning its interpretation or application should be resolved by adjustment and arbitration procedures set forth in the contract and that during the life of the contract there should be "no cessation or stoppage of work, lock-out, picketing or boycotts...." 90 S.Ct. at 1586. A dispute arose when the employer's frozen foods

supervisor and other employees not covered by the bargaining agreement began to rearrange merchandise in the frozen food cases of one of the employer's supermarkets. *Id.* When employer did not accede to the union's demand that the cases be stripped and restocked by union personnel a strike was called and the union began to picket the employer's establishment. *Id.* The employer demanded that the union cease the work stoppage and picketing and sought to invoke the grievance and arbitration procedures specified in the contract. *Id.* In *Boys Markets*, the Supreme Court overruled a prior decision, *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), which held that the anti-injunction provision of the Norris-LaGuardia Act precluded a federal district court from enjoining a strike in breach of a no-strike obligation under a collective bargaining agreement even where the collective bargaining agreement contained provisions for binding arbitration of the grievance dispute regarding which the strike was called. 90 S.Ct. at 1585. The court reconsidered *Sinclair* because the case stood:

> as a significant departure from our otherwise consistent emphasis upon the congressional policy to promote the peaceful settlement of labor disputes through arbitration and our efforts to accommodate and harmonize this policy with those underlying the anti-injunction provisions of the Norris-LaGuardia Act.

*Id.* at 1587.

The *Boys Markets* court noted that Norris-LaGuardia was enacted in response to a large number of pro-management decrees "often issued *ex parte*, drawn on an *ad hoc* basis without regard to any systematic elaboration of national labor policy." *Id.* at 1592. The court stated that the *Sinclair* decision undermined the effectiveness of arbitration and employers would be wary of assuming obligations to arbitrate where, "no similarly efficacious remedy is available to enforce the concomitant undertaking of the union to refrain from striking." *Id.* at 1593. The court in *Boys Markets* concluded that:

> On the other hand, the central purpose of the Norris-LaGuardia Act to foster the growth and viability of labor organizations is hardly retarded—if anything, this goal is advanced—by a remedial device that merely enforces the obligation that the union freely undertook under a specifically enforceable agreement to submit disputes to arbitration.

*Id.* at 1593.

■ Where it is undisputed that the grievance in question is subject to adjustment and arbitration under a collective bargaining agreement and the employer was ready to proceed with arbitration at the time the injunction was sought and obtained, and where the employer would continue to suffer irreparable injury through violation of a no-strike obligation, an injunction may issue. In *Boys Markets*, the following policy was set forth:

> As we have previously indicated, a no-strike obligation, express or implied, is the *quid pro quo* for an undertaking by the employer to submit grievance disputes to the process of arbitration. *See Textile Workers Union of America v. Lincoln Mills, supra* 353 U.S. [448], at 455, 77 S.Ct. [912] at 917 [1 L.Ed.2d 972 (1957)]. Any incentive for employers to enter into such an arrangement is necessarily dissipated if the principal and most expeditious method by which the no-strike obligation can be enforced is eliminated. While it is of course true, as respondent contends, that other avenues of redress, such as an action for damages, would remain open to an aggrieved employer, an award of damages after a dispute has been settled is no substitute for an immediate halt to an illegal strike. Furthermore, an action for damages prosecuted during or after a labor dispute would only tend to aggravate industrial strife and delay an early resolution of the difficulties between employer and union.

90 S.Ct. at 1591.

The Supreme Court recognized that its holding was a narrow one:

"A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance." 370 U.S., at 228, 82 S.Ct., at 1346. (Emphasis in original.) 90 S.Ct. at 1594.

The issue of primary contention between the parties is what is the issue underlying the strike. The union would argue that the dispute underlying the strike is the future wage and fringe benefit contribution levels for existing benefit funds.

The union takes the position that a *Boys Markets* injunction is barred since there has been no showing by Atlantis that the strike is over a dispute which is itself subject to arbitration, and that to the extent that the arbitrable dispute involves whether the union has the right to strike or whether it is barred from a strike, such facts cannot sustain a *Boys Markets* injunction. The union cites the cases of *Jacksonville Bulk Terminals Inc. v. International Longshoremen's Association,* 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982); *Buffalo Forge Co. v. United Steelworkers of America AFL–CIO,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976);

and *Parade Publications Inc. v. Philadelphia Mailers Union No. 14,* 459 F.2d 369 (3d Cir.1972). *Buffalo Forge, supra* involved a sympathy strike where certain office clerical-technical employees went on strike and began picketing. The production and maintenance employees, represented by the respondent union, honored the picket lines of the sister unions and the employer filed suit under § 301(a) of the Labor Management Relations Act, claiming the work stoppage of the production and maintenance employees violated the no-strike clause under the parties' collective bargaining agreement and that the question as to whether the work stoppage violated the no-strike clause was arbitrable under the grievance and arbitration provisions of the contract. 96 S.Ct. at 3145. The district court in that case had denied injunction relief concluding that the strike was not over an arbitrable issue. The Supreme Court in *Buffalo Forge* stated:

> *Boys Markets* plainly does not control this case. The District Court found, and it is not now disputed, that the strike was not over any dispute between the Union and the employer that was even remotely subject to the arbitration provisions of the contract. The strike at issue was a sympathy strike in support of sister unions negotiating with the employer; neither its causes nor the issue underlying it was subject to the settlement procedures provided by the contracts between the employer and respondents.

96 S.Ct. at 3147–3148. The Supreme Court accordingly found that the strike had neither the purpose nor the effect of denying or evading an obligation to arbitrate nor of depriving the employer of its bargain. Thus, the Supreme Court concluded, had the contract not contained a no-strike clause or had the clause expressly excluded sympathy strikes, there would have been no possible basis for implying from the existence of an arbitration clause, a promise not to strike that could have been violated by the sympathy strike in that case. 96 S.Ct. at 3148. The Supreme Court further held that allegations in the complaint in that case that the union was breaching its

obligation not to strike did not in itself warrant an injunction. *Id.* In *Jacksonville Bulk Terminals Inc. v. International Longshoremen's Association*, 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982), the union refused to handle any cargo bound to, or coming from, the Soviet Union due to the Soviet Union's intervention in Afghanistan. The employer alleged the union's work stoppage violated the terms of the collective bargaining agreement which contained a no-strike clause and a provision regarding arbitration of disputes. The Supreme Court held that the work stoppage was not enjoinable, stating:

> The rationale of *Buffalo Forge* compels the conclusion that the Union's work stoppage, called to protest the invasion of Afghanistan by the Soviet Union, may not be enjoined pending the arbitrator's decision on whether the work stoppage violates the no-strike clause in the collective-bargaining agreement. The underlying dispute, whether viewed as an expression of the Union's "moral outrage" at Soviet military policy or as an expression of sympathy for the people of Afghanistan, is plainly not arbitrable under the collective-bargaining agreement.

102 S.Ct. at 2685. The Supreme Court held there that while the question of whether striking over a non-arbitrable issue violates other provisions of the collective bargaining agreement may itself be an arbitrable dispute, the strike was not over an arbitrable dispute and therefore could not be enjoined pending the arbitrator's ruling on the legality of the strike under the collective bargaining agreement. 102 S.Ct. at 2685.

In *Parade Publications, Inc. v. Philadelphia Mailers Union No. 14*, 459 F.2d 369 (3d Cir.1972), a strike arose when the unions alleged the employer entered into an arrangement with a dummy corporation which the unions alleged they were kept totally in the dark regarding and at which the employer had refused to allow the unions' members to apply for work. The employer filed suit against the unions and the district court issued a preliminary injunction enjoining work stoppages by the defendant unions. The parties then stipulated to the entry of a final decree. The complaint filed by the employer did not allege that there was a dispute between the parties which they were bound to arbitrate under the terms of the collective bargaining agreement, but rather that the strike was in violation of the "no strike" clause of the agreement and should be enjoined. 459 F.2d at 370. On appeal by the unions, the case was remanded. The Third Circuit noted that:

> The purpose of *Boys Market* doctrine is to encourage peaceful settlements of disputes by arbitration. An "arbitrable issue" as well as a "no strike" clause is required under the *Boys Market* decision. . . .

459 F.2d at 373. The court concluded that the employer had not provided the necessary proof and the district court had not made the necessary findings:

> In this case, we cannot find that the employer provided the requisite proof or that the court made the requisite findings. As Parade stresses, the preliminary injunction was subject to two conditions: (1) that either party was "at liberty to commence arbitration proceedings with respect to any dispute which underlies this alleged walkout" and (2) that the employer fulfill "its obligations to arbitrate, as set forth in the contract." These conditions, however, do not in our judgment evidence a finding by the court as to what caused the strike and whether the underlying issue is arbitrable. We conclude that the case should be remanded for the court to hear evidence and determine these issues.

*Id.* at 373–74. Both *Jacksonville Bulk Terminals* and *Parade Publications*, stand for the position that before granting an application for injunction against a strike, the court must find the cause of the strike and whether the underlying dispute is arbitrable under the collective bargaining agreement.

The court in *Parade* stated that it expressed no opinion as to whether the underlying dispute was arbitrable, but noted:

On the other hand, the arbitration clauses in these collective bargaining agreements are broad in scope and Parade is entitled to the benefit of the "strong presumption in favor of arbitrability" discussed by this Court in *Avco Corporation v. Local Union No. 787 of International Union*, 459 F.2d 968, 973 (3d Cir. 1972).

459 F.2d at 374.

In *Avco Corporation v. Local Union No. 787 of International Union*, 459 F.2d 968 (3d Cir.1972), employees of the union refused overtime until such time as certain laid off employees were rehired. The collective bargaining agreement contained, *inter alia*, a no-strike clause and a broad compulsory arbitration clause. The court noted that in *Boys Markets*, the court had looked at the policies behind the anti-injunction provisions of Norris La-Guardia and:

an equally strong policy to encourage the settlement of labor disputes through enforcement of compulsory arbitration agreements.

459 F.2d at 970. The court in *Avco* concluded that in *Boys Markets*:

it appears that the policy in favor of enforcing the settlement of labor disputes through compulsory arbitration emerged dominant.

*Id.* at 971. In *Avco*, the court held that even though the contract was silent as to compulsory overtime, it regulated hours and wages, including overtime. *Id.* at 970. The court concluded that the underlying dispute in that case was a matter subject to arbitration and thus the strike was enjoinable. *Id.* at 973–74. The court recognized a strong presumption towards arbitration, citing to prior case law:

To ensure maximum utilization of the arbitral process, the Supreme Court in *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), held that, when a party sought to compel arbitration in a suit under section 301 of the Labor-Management Relations Act, courts should resolve questions of interpretation of the arbitration clause by applying

a strong presumption in favor of arbitrability. By making the presumption difficult to rebut the Court ensured that in virtually every case in which one party sought arbitration the dispute would be settled by the arbitrator. The presumption in favor of arbitratility applies even to the interpretation of contract provisions going to the scope of arbitral authority.

*Id.* at 973.

The *Avco* court noted that in *Warrior & Gulf*, the Supreme Court noted that in absence of an express provision excluding the subject from arbitration, there must be forceful evidence to exclude the claim from arbitration particularly where the arbitration clause is quite broad. *Id.* Such a case of express exclusion existed in *In re Cantamount Dyers Inc.*, 24 B.R. 59, 62 (Bkrtcy.D.Vt.1982), where, under the collective bargaining agreement, arbitration was clearly excluded in regards to the obligation of the employer to pay in full any wages due to employees under the contract. Since the dispute arose over debtor-employer's failure to implement a wage increase called for in the agreement, the court held an injunction of the strike could not issue. *Id.* at 62.

This court, under the mandate of *Boys Markets, supra*, must as a threshold matter, determine the dispute underlying the strike. The union argues that the dispute underlying the strike was the wage and fringe benefit contribution levels for the remainder of the contract, which issue is not subject to mandatory arbitration, and which Atlantis, through counsel, has refused to submit to voluntary arbitration.

Atlantis asserts that the dispute is over the issue of whether there in fact remains an agreement and the respective rights of the parties under the wage reopener, specifically the respective rights of the parties and their differing interpretations of their rights under the wage reopener clause of the collective bargaining agreement in the event the parties were unable to reach agreement on wages and benefit contribution levels on or before September 15, 1986. Atlantis agrees that these issues are arbi-

trable and Atlantis is willing to submit this dispute to arbitration. The union argues that the only issue existing under the wage reopener clause is the union's right to strike in the face of the no-strike clause of the collective bargaining agreement, which the union maintains cannot support a *Boys Markets* injunction.

The union would characterize the dispute between the parties in bare economic terms, that is, the level of wage and fringe benefit contributions for the remainder of the contract term. This overlooks the fact that the economic issue and the no-strike clause arises within the larger context of the wage reopener clause and that the interpretation or application of that clause is arbitrable within the broad grievance and arbitration procedures contained in Article IV of the Collective Bargaining Agreement.

■ This court finds that the dispute between the parties, giving rise to the strike concerns the respective rights of the parties and their differing interpretations of the wage reopener clause of the Agreement. The interpretation of that clause, or of any acts, conduct or relations between the parties directly or indirectly, which arise out of the contract is contained within the broad grievance and arbitration provisions of Article IV of the Agreement.

The parties agree that Section 8 of the Norris-LaGuardia Act 29 U.S.C. § 108 provides that a party in order to obtain injunctive relief must be willing to submit to arbitration. Atlantis is ready, willing and able to submit the arbitrable issue—that being the rights of the parties under the wage reopener clause, to arbitration, and will be ordered to do so.

Robert Bruce McKee, the Vice President of Finance and Chief Financial Officer of Atlantis also testified before this court on September 25, 1986. McKee testified that a strike by the union would result in a substantial disruption in the ability of Atlantis to service its food and beverage operation, and have a negative effect on its hotel business. McKee further testified that during the period from September 15, 1986 to the end of October 1986, Atlantis has advanced confirmed hotel bookings in the aggregate sum of $700,000.00, confirmed banquet business in the sum of $60,000.00 and scheduled bus services to the casino bringing a substantial number of patrons to the casino premises. McKee stated that although the casino would continue to operate during a strike, the casino customers make use of the Atlantis' food and hotel services, and a strike by the union would have a negative effect on the Atlantis' overall business. McKee further testified that from 12:01 a.m. on September 16, 1986 to approximately 4:00 p.m. on September 17, 1986,[1] the union engaged in a strike. McKee further testified that the total gross revenues for Atlantis for the three-day period of September 16, 1986 through September 18, 1986 decreased by the amount of approximately $425,000.00 as compared to the same three-day period for the prior week.

Under the other elements of *Boys Markets* the court is satisfied based upon the uncontroverted affidavit of Robert Bruce McKee, and his testimony in court that the threatened work stoppage by Local 54 would impair the debtor's ability to service its customers. Local 54 job categories include cooks, kitchen utility workers, food services, buspersons, bartenders, bellpersons, doorpersons, porters, room attendants, and other food services and hotel workers. A strike will impair Atlantis' chartered bus trade, result in closure of all but one restaurant/food service outlet, and prevent Atlantis from servicing its hotel and gaming customers, which will result in severe economic losses to Atlantis' business. The harm to the union is minimal, since it will continue to function under the existing terms and conditions of the Collective Bargaining Agreement.

Accordingly, upon the condition that the injunction bond in the amount of $1,000.00 previously posted remain in effect, a preliminary injunction shall issue, pending final determination of this action enjoining and restraining defendants, their officers,

---

**1.** In the oral opinion given on September 29, 1986, the court erroneously stated that Mr. McKee's testimony was that the strike lasted until 4:00 p.m. on September 18, 1986, instead of September 17, 1986, the correct date. *See* page 33 of transcript of September 25, 1986.

agents, servants, employees and members, and all persons in active concert or participation with them from: (a) directly or indirectly authorizing, assisting, encouraging, participating in or sanctioning any strike, picketing, sitdown, sit-in, slowdown, cessation or stoppage or interruption of work, boycott, or other interference with the operations of Atlantis; (b) refusing to inform all employees of Atlantis covered by the collective bargaining agreement between the parties that the work stoppage or picketing at Atlantis is in violation of that agreement; (c) refusing to instruct such employees to cease any such unlawful conduct. The court shall further order the parties to comply with the grievance and arbitration provisions of the collective bargaining agreement.

A hearing on the debtor's request for a permanent injunction shall be held on October 10, 1986.

An order consistent with this opinion was entered on October 3, 1986.